**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LAUREN HOLLAND,

                Plaintiff,

   -against-

CREDITSIGHTS, INC.; FITCH GROUP, INC.,

              Defendants.

Case No.: 26-CV-273

**<u>AMENDED COMPLAINT</u>**

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Plaintiff Lauren Holland ("Plaintiff" or "Plaintiff"), by her attorneys Mesidor PLLC, complaining of Defendants CreditSights, Inc., ("Defendant CreditSights") and Fitch Group, Inc. ("Defendant Fitch Group" and collectively with Defendant CreditSights, "Defendants" or "The Company" or "CS Group") alleges, upon knowledge as to herself and her own actions and upon information and belief, as to all other matters as follows:

<u>NATURE OF CLAIMS</u>

1.      Plaintiff , by and through her undersigned counsel, alleges violations of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (the "EPA"); the New York State Human Rights Law, N.Y. Exec. L. §§ 290 et seq. (the "NYSHRL"); and New York Labor Laws §§ 194 and 215  et seq. (the "NYLL"), and seeks damages to redress the injuries Plaintiff suffered as a result of being subjected to unlawful discrimination and retaliation by Defendant.

<u>JURISDICTION AND VENUE</u>

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts federal law claims under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (the "EPA"). The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the actions or omissions giving rise to the claims alleged herein occurred within this judicial district.

## PARTIES

4.    Plaintiff is a Black female who, at all relevant times, was employed by Defendant CreditSights.

5.    Defendant CreditSights is a multinational financial analysis and market research Company registered to do business under the laws of the State of Delaware.  Upon information and belief, Defendant CreditSights' main corporate office located at 2 Park Avenue, Floor 24, New York, NY, 10016.  Upon information and belief, they are a wholly owned subsidiary of Fitch Group, Inc. as of January 2021. Defendant CreditSights employs or employed persons within New York City.

6.    Defendant Fitch Group is a provider of financial data, research and analytics.  They are registered to do business under the laws of the State of Delaware, with its main corporate office located at 33 Whitehall Street, New York, NY, 10004. Defendant Fitch Group employs or employed persons within New York City.

7.    At all times relevant, CS Group employed more than fifteen employees.

8.    Upon information and belief, CS Group maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

9.    At all times relevant, CS Group was and are an "employer" and Plaintiff's employer as defined by all applicable statutes referenced herein.

## MATERIAL FACTS

10.     Plaintiff is a Black female credit analyst with over two decades of experience in investment research and portfolio management.

11.     At the time of her hire in July 2015, Plaintiff earned a salary of approximately $175,000 and served as a Senior Analyst, Paper & Packaging ("Senior Analyst") at CreditSights.

12.     Over the next nine years, Plaintiff would become the most senior Black analyst at the firm globally and the only female Senior Analyst in credit research in the United States.

13.     She would remain in this role until July of 2024, when the Company would terminate her employment for pretextual reasons.

14.     At the time of her termination, Plaintiff earned a salary of approximately $250,000 and her total compensation was significantly less than her male and non-Black counterparts.

15.     As a Senior Analyst in Paper & Packaging at CreditSights, Plaintiff functioned as the Global Head of Paper and Packaging Research within the Company, responsible for advising both buy-side and sell-side clients. As part of this role, she provided clients with investment advice and sector strategy. Plaintiff also managed a team of analysts in Europe.

16.     Plaintiff performed her duties exceptionally well, always received positive feedback and maintained an unblemished performance history. This continued even after Fitch acquired CreditSights in 2021.  Plaintiff received her first and only two written performance reviews for her work in 2022 and 2023, with ratings of "meets expectations" and "valued contributor."

17.     In fact, Plaintiff received positive feedback from clients, including a company-wide email message highlighting positive recognition from PIMCO, the Company's largest client, in July 2022.  Additionally, Plaintiff volunteered as co-chair of the BALANCE employee resource

group at the Fitch Group, demonstrating further dedication to the Company outside of her work responsibilities.

**CreditSights' Pervasive Discriminatory Culture Targeting Plaintiff's Race and Gender**

18.    Almost from the beginning of her employment, CreditSights began to subject Plaintiff to race and gender-based discrimination and harassment.

19.    For instance, in June of 2016, about one month after Plaintiff joined the Company, Erin Lyons ("Ms. Lyons"), who is now the chief executive officer ("CEO") of CreditSights, incredulously questioned how Plaintiff could afford the designer bag that she was carrying, implying that a Black woman could not legitimately afford such an item.

20.    Upon information and belief, Ms. Lyons never questioned how her non-black peers could afford their accessories.  Ms. Lyons made this inquiry of only Plaintiff solely due to her race.

21.    Throughout Plaintiff's tenure, CreditSights also discriminated against her in the terms and conditions of her employment by subjecting her to heightened performance standards and baseless criticism based on her race.

22.    Ms. Lyons also made discriminatory comments about Plaintiff's hair. In connection with a Company conference at which Plaintiff was scheduled to present, Plaintiff obtained a blowout. Upon seeing Plaintiff, Ms. Lyons remarked that she "liked [Plaintiff's] hair much better like that," referring to Plaintiff's temporarily straightened hair. Plaintiff wears her hair naturally, and straightening it is both costly and potentially damaging. Ms. Lyons's comment conveyed that Plaintiff's natural hair was less professional or acceptable, thereby reinforcing race-based stereotypes and contributing to a discriminatory work environment.

23.    The Company held Plaintiff's non-Black peers to one standard and held Plaintiff to another, more heightened standard.

4

24.     Ms. Lyons continued to treat Plaintiff differently and less well than her non-black and male counterparts throughout her tenure, subjecting Plaintiff to constant scrutiny and humiliation, questioning Plaintiff's competence as an analyst and her fitness to be in front of clients, and issuing statements that were demeaning, humiliating, and designed to undermine Plaintiff's professional reputation and standing.

25.     In fact, from the onset of Plaintiff's employment, Ms. Lyons attempted to paint a false narrative about Plaintiff's performance inside and outside the Company, which had the effect of damaging Plaintiff's reputation and limiting her opportunities for advancement.

26.     For example, in the fall of 2016, Ms. Lyons falsely complained to "Mr. Chris Ucko", the then head of research, and to Mr. Brady, Plaintiff's supervisor, that Plaintiff was unprepared for a meeting. In fact, the meeting in question was convened by the Company's strategy team, which had appointed Plaintiff to participate with less than 24 hours' notice and without providing any guidance regarding the meeting's agenda or expectations. Ms. Lyons's complaint was baseless and not grounded in any legitimate business concern. Rather, it was motivated by discriminatory animus on the basis of Plaintiff's race.

27.     In the summer of 2019, Ms. Lyons again falsely accused Plaintiff of being unprepared for the same meeting. Because of this baseless accusation, Ms. Lyons claimed she would not want Plaintiff in front of clients. This contradicted all evidence of Plaintiff's actual work ethic, as she was well regarded by the Company's sales force who routinely arranged meetings with Plaintiff for clients, in both the US and Europe. Ms. Lyons made these false statements about Plaintiff in the presence of other employees, which further damaged Plaintiff's professional reputation and subjected her to humiliation.

28. Once, again, it was clear Ms. Lyons was holding Plaintiff to a different standard than her non-Black peers and sought to damage her professional reputation.

29. Ironically, shortly thereafter, Plaintiff met with a very large client of the Company who was so impressed with her work that she received praise from Mr. Chris Ucko, demonstrating that Ms. Lyons's criticisms were unfounded and pretextual.

30. Additionally, around June or July 2018, Lloyd Ucko ("Mr. Lloyd Ucko"), a salesperson and father of the former CEO Chris Ucko ("Mr. Chris Ucko"), made offensive comments about Plaintiff inviting Black professionals to a Company-hosted event that she organized.

31. Although each and every person whom Plaintiff invited was either a current or prospective client, Mr. Lloyd Ucko told Plaintiff's coworkers that Plaintiff was using the Company's money to "entertain [her] friends," apparently due to their shared racial identity. These offensive comments negatively impacted Plaintiff's professional reputation.

32. This was in sharp contrast to when non-Black employees invited white or non-Black professionals to events as these employees were never subjected to similar comments or scrutiny.

33. It became evident, however, that racist comments and racial harassment were a widespread problem at CreditSights that continued throughout Plaintiff's entire time at the Company and that Defendants knowingly permitted, condoned, and ratified this discriminatory and harassing conduct.

34. For instance, Plaintiff would recognize Ms. Lyons' behavior also extended to other employees of color.

35.    On one such instance, Plaintiff observed Ms. Lyons make inappropriate race-based comments to an Asian coworker.

36.    On another occasion, in December of 2017, a coworker used the "n" slur to Plaintiff during a company Christmas party.  Plaintiff was shocked and disgusted by her colleague's casual use of one of the most dehumanizing racial slurs. To underscore, the "n" word was used several times within the course of this conversation alone.

37.    In March 2024, Plaintiff witnessed a coworker make offensive and inappropriate comments about race during a Company lunch. Both Andrew Brady ("Mr. Brady") and Christopher Snow ("Mr. Snow"), who were present and held leadership roles, observed the conduct but failed to intervene or address it at the time. Although Mr. Snow later called Plaintiff to apologize, upon information and belief, he did so at the direction of Human Resources rather than on his own initiative. The coworker who made the remarks had retired shortly thereafter, but leadership still failed to acknowledge or address the broader issue of pervasive racial insensitivity within the workplace.

38.    All of these incidents were the direct result of a workplace environment that CreditSights knowingly cultivated and effectively encouraged egregious acts of racial discrimination and harassment by its employees.

39.    Ms. Lyons' constant, baseless criticism damaged Plaintiff's professional reputation and ability to advance within the Company and had a significant negative impact on her mental health. Plaintiff  realized that Ms. Lyons' racism would make it impossible to reach her full potential at CreditSights, and it was evident that Ms. Lyons treated Plaintiff differently than her white peers. Ms.Lyons' conduct was often public and designed to embarrass Plaintiff, causing her to become very depressed and anxious, resulting in physical symptoms and requiring medical

treatment. As a direct result of the hostile, abusive, and discriminatory work environment, Plaintiff suffered severe emotional distress, anxiety, depression, loss of sleep, physical symptoms including weight gain and gastrointestinal distress, and was required to seek medical and mental health treatment.

**The Company Discriminated against Plaintiff Based on her Race and Gender With Respect to Compensation and in violation of Equal Pay Act and New York Laws**

40.     In December 2020, Plaintiff learned that CreditSights was paying her significantly less than her male and non-Black peers for no justifiable reason despite her performing equal work on jobs requiring equal skill, effort, and responsibility.

41.     At that time, Plaintiff had scheduled a meeting with Chief Executive Officer Peter Petas ("Mr. Petas") to discuss her compensation. The meeting occurred in the context of the company's stated concern about employee retention.

42.     In preparation for this meeting, Plaintiff met with her Managing Director, the head of her Group Base, who confirmed that her similarly situated male colleagues were all earning significantly more than her. No justification was provided as to this pay disparity.

43.     Plaintiff was particularly concerned by this information, as she performed the same core functions as her peers, and her position required equal skill, effort, and responsibility.

44.     In fact, Plaintiff arguably bore greater responsibility than some of her comparators. For example, she was responsible for publishing written research and coverage of over thirty (30) companies within her assigned sectors which was substantially more than colleagues who, at most, covered up to twenty (20) companies.

45.     Plaintiff's similarly situated non-Black colleagues included Wen Li and Chas Johnson, both of whom held Senior Director positions and performed substantially similar work under comparable conditions requiring equal skill, effort, and responsibility. In addition,

8

CreditSights hired an external candidate into a senior role for which Plaintiff had applied internally and for which she possessed relevant sector experience that said candidate lacked. During the height of the pandemic, Defendants further reassigned Plaintiff's junior analyst to said candidate, forcing Plaintiff to recruit and train a new external hire remotely, thereby placing additional burdens on her that were not imposed on her peers.

46. Upon information and belief, Plaintiff's similarly situated non-Black colleagues also possessed similar educational backgrounds and experience as Plaintiff and

47. Yet upon information and belief, Plaintiff's similarly situated male and non-Black colleagues were earning approximately $85,000 more than Plaintiff as Plaintiff's similarly situated male and non-Black peers were earning at least $400,000 in total compensation.

48. For example, as early as 2018, Plaintiff's colleague Wen Li, a male and non-black similarly situated colleague, he admitted to Plaintiff that he was at the salary cap, which at the time was $400,000.

49. By contrast, Plaintiff total compensation, including base salary and bonus, in 2019 was approximately $320,000, and in 2020, was approximately $350,000.

50. In or around early 2021, Plaintiff met with Mr. Petas to discuss this pay disparity and requested an increase in base salary and a higher bonus to match that of her non-Black, male peers. This constituted protected activity under the NYLL and NYSHRL.

51. At the time, Mr. Petas told Plaintiff that her bonus could not be adjusted but that her base salary could be reevaluated "down the line." Mr. Petas did not provide any justification or explanation as to why Plaintiff was earning less than her non-Black, male colleagues.

52.     Despite this discussion, Mr. Petas nor his successor ever revisited the topic of Plaintiff's salary or bonus and, as a result, Plaintiff continued to be undercompensated in comparison to her male and non-Black peers.

53.     In 2022, Plaintiff's Managing Director once again advised her that she was significantly underpaid as compared to her similarly situated peers and had been underpaid for years.

54.     As of the date of her termination on July 29, 2024, Plaintiff's total compensation never reached the estimated $400,000 earned by similarly situated colleagues outside of her protected classes - some of whom had reached that level of compensation as early as four years prior.

55.     In addition, Plaintiff's non-Black and male colleagues regularly received stock options as part of their total compensation package.  Plaintiff, by contrast, received stock options on only one occasion during her entire tenure with the company.

56.     Despite holding comparable roles and responsibilities, if not greater, Plaintiff was consistently paid substantially less than her male and non-Black counterparts.  These facts give rise to a reasonable inference of unlawful pay discrimination based on race and gender.

**The Company Intentionally Under-Resourced Plaintiff Compared to Her Peers and Subjected Her to a Heightened Workload Based on Her Race and Gender**

57.     Compounding the lower pay and heightened expectations was CreditSights's intentional decision to under-resource Plaintiff and overwork her compared to her non-Black and male peers.

58.     Throughout her employment, the Company denied Plaintiff the same type of meaningful performance feedback as her male and non-Black peers.

59.     In December 2020, Plaintiff learned that her supervisor, Mr. Brady, had misrepresented the nature of their one-on-one meetings to Mr. Snow, the Head of Research. Specifically, Mr. Brady claimed that he had consistently provided Plaintiff with feedback on her work during their weekly meetings throughout the year. This statement was demonstrably false as Mr. Brady rarely gave Plaintiff any substantive or constructive feedback during these meetings.

60.     Instead, the meetings were largely perfunctory, held only to satisfy the formal requirement that managers meet regularly with their direct reports. Mr. Brady's failure to provide the feedback he falsely claimed to have given, coupled with his deliberate misrepresentation to senior management, led Plaintiff to reasonably believe that she was being set up to fail in her role. This differential treatment was based on Plaintiff's race and gender.

61.     Importantly, Plaintiff had an increased workload as compared to her peers while being provided with less support and resources.

62.     In or around June 2020, the Company intentionally reassigned Plaintiff's junior analyst away from her team, despite Plaintiff's ongoing need for experienced support. This reassignment was not a lateral move initiated by the junior employee, but a deliberate decision by management to remove him from Plaintiff's team. Notably, approximately one year earlier, the Company had also attempted to reassign this same junior analyst away from Plaintiff, further evidencing a pattern of deliberately de-resourcing Plaintiff. As a result, Plaintiff was left without adequate support and was required to train a newly hired employee while simultaneously managing a significantly increased workload during the COVID-19 pandemic.

63.     Plaintiff's responsibilities included cross-border coverage of both U.S. and European markets, which forced her to begin her workday as early as 3:00 AM in order to keep up with demands. No other analyst was subject to such extreme conditions, and their workloads were

11

substantially lighter by comparison. Despite these inequitable circumstances, the Company failed to provide Plaintiff with the level of support afforded to her peers.

64.     This pattern of unequal treatment and under-resourcing persisted throughout Plaintiff's employment. In June 2023, the Company again failed to provide Plaintiff with adequate support compared to her non-Black peers. When Plaintiff's junior employee left for an external opportunity, her team was left with a critical staffing gap. Unlike similarly situated non-Black colleagues whose junior vacancies were filled promptly, the Company did not take timely or appropriate steps to fill Plaintiff's vacancy, leaving Plaintiff to operate without junior support for more than a year despite the clear operational need.

65.     Around that time, a new analyst, one whom Plaintiff had personally recruited to the Company and who had previously interned under her supervision, was scheduled to join the firm. Plaintiff requested that this analyst be assigned to fill the open position on her team in August or September. However, Mr. Snow denied the request, stating that "she was the firm's hire and not [Plaintiff's] hire." The analyst was instead assigned to another employee who already had a junior supporting them, leaving Plaintiff with no support. This disparate treatment of depriving Plaintiff of necessary resources while similarly situated non-Black colleagues received adequate staffing was motivated by Plaintiff's race.

66.     Despite managing a significantly heavier workload than many of her non-Black and male peers, Plaintiff continued to be denied adequate support. In June 2024, she inquired when the Company would assign her a junior analyst to assist with her responsibilities. This request was made in light of the fact that her performance was being measured against that of similarly situated colleagues all of whom had the benefit of junior analysts to support their work, while Plaintiff was forced to manage her responsibilities independently.

67.     The Company never responded to or resolved Plaintiff's request. This ongoing failure to provide her with the same resources afforded to her non-Black and male peers—despite subjecting her to the same performance expectations—constitutes disparate treatment based on race.

**CreditSights Engaged in Discriminatory Hiring and Promotional Practices Based on Race and Gender**

68.     Throughout Plaintiff's employment with CreditSights, she both witnessed and experienced the Company engaging in discriminatory hiring and promotional practices. The Company uplifted and highlighted white men, automatically accepting them as qualified, if not the "gold standard" for research, all while women and employees or applicants of color were scrutinized, disregarded, and dismissed.

69.     Although the Company publicly touted its diversity, equity, and inclusion ("DEI") commitments, these efforts were largely performative. Plaintiff was the only Senior U.S.-based female analyst and the most senior Black analyst at the firm. While another Black analyst was employed before Plaintiff, he had less experience, no junior analyst assigned to him, and was intentionally "juniorized" despite demonstrating the ability to independently produce work. Because of the Company's DEI mandate requiring "diverse" interview panels, Plaintiff was repeatedly asked to participate in interview panels, which increased her workload relative to her white male counterparts and resulted in additional uncompensated labor.

70.     Moreover, convincing the Company to hire diverse talent was an uphill battle Plaintiff often fought alone.

71.     On multiple occasions, Plaintiff referred well-qualified candidates from her professional network to the Company. However, the Company either mishandled these referrals or disregarded them entirely. As a respected senior professional, Plaintiff found it humiliating that

the Company repeatedly ignored her recommendations for qualified candidates. Furthermore, management made disparaging remarks suggesting that referrals from Plaintiff's network were inferior to others, without providing any legitimate or reasonable explanation for this bias.

72.     For example, in June 2021, Plaintiff selected a highly qualified new hire to fill a vacancy on her team after a junior employee left the Company. Plaintiff had previously considered this applicant for another role the year prior, and he was still interested in joining the Company. Plaintiff was shocked by how CreditSights's leadership handled her recommendation, seemingly because the applicant was Black. Managers objected to her hiring him, asking inappropriate questions about why he was still available and questioning his competence. In reality, the applicant could afford to be patient while searching for the right role instead of taking any job offered to him. The Company did not similarly scrutinize white applicants.

73.     Another example occurred in or around June 2022. CreditSights interviewed a Black male candidate whom Plaintiff had introduced to the Company. He was a PhD candidate and highly qualified. However, after three or four rounds of interviews, the Company decided he was ineligible for the program Plaintiff had recommended him for. Plaintiff expressed that she felt this was a mishandling of talent, especially given the DEI mandate. She raised this concern to Mr. Snow, who was dismissive and said he did not think this was a significant issue.

74.     Conversely, in or around June 2023, Plaintiff also participated on an interview panel, interviewing, among others, a white male candidate for a junior role. It was quickly apparent that this candidate misrepresented his level of knowledge of accounting both on his resume and during his interview. During his live interview, he became caught in this lie after being asked a basic question. Despite his clear inadequacy for the role, Mr. Snow recommended that this applicant continue to the next round of interviews, attributing the dishonesty to the applicant being

14

"young." Plaintiff objected and advocated hiring two well-qualified diverse applicants instead, including a Black applicant and a female applicant who identifies as LGBTQ. Had Plaintiff not spoken up, the Company would likely have hired the white male applicant over these more qualified, diverse applicants. Plaintiff's advocacy for diverse, qualified candidates constituted protected activity.

75.    Similarly, in or around the same interview process of June 2023, Plaintiff also evaluated a Black male candidate, approximately one to two years post-college and a graduate of a Historically Black College or University ("HBCU"), who otherwise performed well during his interviews. Despite his qualifications, two white male interviewers expressed reservations about this candidate based on the manner of his speech, noting that he occasionally stuttered when nervous. These concerns were raised as a basis to question his candidacy. This treatment stood in stark contrast to the Company's acceptance of a white male senior analyst and group head, who had a contractual provision excusing him from public speaking or presentations due to his stutter and who nonetheless remained in a leadership role for nearly four years. The disparate treatment of similarly situated candidates and employees based on race reflects discriminatory bias in the Company's hiring and evaluation practices.

76.     CreditSights also denied Plaintiff two promotions based on her race and gender.

77.    In 2021, there were two vacancies for which Plaintiff was very well qualified and which would have been a promotion from her role. One opening was within Automotive, and the other was with Industrials/Transports. Plaintiff has experience in both sectors and expressed her interest in both open positions. However, the Company hired two external, less qualified white men to fill these roles -- filling the Industrials/Transports role in September 2021 and the Automotive role in January 2022. Upon information and belief, the Company also paid these new

hires a larger salary than Plaintiff. Plaintiff complained about being passed over for these promotions, which constituted protected activity under applicable anti-discrimination and anti-retaliation laws.

**CreditSights Summarily Terminated Plaintiff's Employment Based on Her Race and Gender and In Retaliation for Her Complaints of Discrimination.**

78. On July 29, 2024, CreditSights suddenly terminated Plaintiff's employment with no prior notice, effective immediately. The Company's stated reason for terminating her employment was that it had "eliminated [her] role."

79. This explanation is patently untrue and pretextual for discrimination based on her race and gender and retaliation for her Plaintiff's engagement in protected activities.

80. CreditSights's explanation that the Company eliminated her role is pretextual for discrimination based on her race and gender. Plaintiff was the most senior Black analyst at the firm globally and the only female Senior Analyst in credit research in the United States. She was also one of only two Black employees on her team (including another Black employee Plaintiff recruited and who was hired in September 2023). Tellingly, Plaintiff was the only employee on her team of 15-18 employees and the only employee out of over 150 employees in research who the Company "let go." Moreover, this notification came less than two months after Plaintiff pointed out that she was the only member of her team without a junior, which itself constituted a complaint of discriminatory treatment and protected activity.

81. Plaintiff's responsibilities were clearly important and necessary and there was no justification for "eliminating" her role. This is evidenced by the fact that the Company has expressed the intent to either hire another employee to fill Plaintiff's role or transfer her responsibilities to a white male colleague. This excuse was simply the Company's pretextual way

16

of terminating Plaintiff's employment based on her race and gender and in retaliation for her protected activity.

82.    Plaintiff engaged in protected activity throughout her employment, including but not limited to: (a) complaining about pay disparities based on race and gender to Mr. Petas in early 2021; (b) complaining about pay disparities to her Managing Director in 2022; (c) complaining about being denied adequate resources and support compared to non-Black and male colleagues in June 2024; (d) complaining about racist comments made by coworkers in December 2017 and March 2024; (e) advocating for diverse candidates and objecting to discriminatory hiring practices; and (f) complaining about being passed over for promotions in favor of less qualified white male candidates.

83.    Defendants were aware of Plaintiff's protected complaints and opposition to discriminatory practices.

84.    There is a causal connection between Plaintiff's protected activity and her termination. Plaintiff's termination occurred shortly after she complained about the lack of resources in June 2024 and followed a pattern of complaints about discrimination throughout her employment.

85.    Defendants' proffered reason for Plaintiff's termination—that her role was eliminated—is pretextual, as evidenced by the fact that Defendants intend to fill her role or transfer her responsibilities to another employee, and no other similarly situated non-Black or male employees were terminated.

### FIRST CAUSE OF ACTION
### FOR DISCRIMINATION UNDER SECTION 1981

86.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

87.    42 U.S.C. § 1981 states, in the relevant part, as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

88.    As described herein, Defendant discriminated against Plaintiff on the basis of her race in violation of Section 1981, by fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment and terminating her employment, and by subjecting her to discriminatory terms and conditions of employment, including but not limited to unequal pay, unequal resources and support, heightened performance standards, and denial of promotional opportunities.

89.    This includes the right to compensation and to be free from racial discrimination in the terms, conditions, and privileges of employment, including compensation.

90.    Plaintiff, a Black woman, was paid significantly less than her similarly situated non-Black colleagues, despite performing the same or substantially similar work, and despite having equal or greater responsibilities.

91.    Defendant's conduct in paying Plaintiff less than non-Black employees and in under-resourcing Plaintiff despite the heavy workload she managed compared to her non-Black and male peers, was motivated, at least in part, by racial animus and constitutes intentional discrimination in violation of 42 U.S.C. § 1981.

92.    As a result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff suffered economic loss, for which she is entitled to an award of monetary damages and other relief.

18

93.     Defendant's actions impaired Plaintiff's rights to make and enforce her employment contract on an equal basis with non-Black employees.

94.     As a result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

95.     The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**FOR RETALIATION UNDER SECTION 1981**

96.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

97.     As described herein, Plaintiff engaged in activities protected by Section 1981 by complaining of racial discrimination and retaliation, including but not limited to complaining about pay disparities, hostile work environment, unequal treatment, discriminatory denial of resources and support, and discriminatory hiring and promotional practices.

98.     After Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff as described herein.

99.     Defendant would not have terminated Plaintiff, but for Plaintiff's complaints of discrimination and retaliation.

100.    Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

19

101.   As a result of Defendant's unlawful conduct in violation of Section 1981, Plaintiff has suffered economic loss, for which Plaintiff is entitled to an award of monetary damages and other relief.

102.   As a result of the unlawful conduct of Defendant in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

103.   The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to and an award of punitive damages.

## THIRD CAUSE OF ACTION
## FOR VIOLATION OF THE EQUAL PAY ACT OF 1963

104.   Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

105.   29 U.S.C. §206(d) provides that it shall be a violation of the Fair Labor Standards Act for an employer:

> [To] discriminate ….between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions…

106.   As described herein, Defendant discriminated against Plaintiff on the basis of sex by failing to pay her at a rate comparable to her male peers.

107. Plaintiff and her male comparators performed jobs that required equal skill, effort, and responsibility, and were performed under similar working conditions.

108. Plaintiff was paid significantly less than similarly situated male employees who performed the same or substantially similar job duties, and who were subject to the same standards and expectations. Indeed, Plaintiff performed work requiring greater skill, effort, and responsibility than some of her male comparators who were paid substantially more.

109. Defendant willfully violated the EPA by knowingly paying Plaintiff less than her similarly situated male peers for equal work.

110. The unlawful discriminatory actions of Defendant constitute repeated and willful violations of §206, for which Plaintiff is entitled to the maximum allowable damages.

## FOURTH CAUSE OF ACTION
## NYSHRL: SEX & RACE DISCRIMINATION AND RETALIATION

111. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

112. The NYSHRL prohibits an employer from discriminating against an employee in compensation or in the terms, conditions, or privileges of employment because of the employee's race and/or sex.

113. Plaintiff, a Black woman, was paid significantly less than her similarly situated non-Black and male colleagues, despite performing equal or greater work under similar working conditions.

114. Defendant intentionally discriminated against Plaintiff because of her sex in violation of the NYSHRL. Defendant discriminated against Plaintiff by, *inter alia,* assigning her greater volumes of work with fewer resources than her male peers, subjecting her to a differential

21

in pay despite being assigned greater volumes of work, subjecting her to a racially and gender-based hostile work environment, denying her promotional opportunities, and terminating her employment based on her race and gender and otherwise subjecting her to differential treatment due to her race and sex.

115. Defendant did not subject similarly situated male employees to similar treatment.

116. Defendant failed to provide any legitimate, non-discriminatory reason for the compensation disparities between Plaintiff and her similarly situated non-Black and male peers.

117. Plaintiff engaged in protected activity under the NYSHRL by complaining about discriminatory treatment, including pay disparities, hostile work environment, unequal resources, and discriminatory hiring and promotional practices.

118. Defendants retaliated against Plaintiff for engaging in protected activity by, inter alia, maintaining pay disparities, denying promotional opportunities, failing to provide adequate resources, and ultimately terminating her employment.

119. Defendant acted in a willful and wanton manner and in callous disregard for Plaintiff's protected rights.

120. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

121. Plaintiff is entitled to all remedies available under the NYSHRL, including compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

122.    Defendant acted in a willful and wanton manner and in callous disregard for Plaintiff's protected rights.

123.    The unlawful discriminatory actions of Defendant constitute repeated and willful violations of the NUSHRL, for which Plaintiff is entitled to the maximum allowable damages.

**FIFTH CAUSE OF ACTION**
**NEW YORK LABOR LAW § 194**

124.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

125.    N.Y.L.L § 194, in relevant part states:

No employee with status within one or more protected class or classes shall be paid a wage at a rate less than the rate at which an employee without status within the same protected class or classes in the same establishment is paid for:
(a) equal work on a job the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions, or
(b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions; except where payment is made pursuant to a differential based on: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production or (iv) a bona fide factor other than status within one or more protected class or classes, such as education, training, or experience.

126.    Plaintiff was paid less than her male and non-Black colleagues despite performing substantially similar work and having equal or greater responsibilities.

127.    The pay disparity was not based on a seniority system, merit system, system measuring earnings by quantity or quality of production, or any bona fide factor other than sex or race.

23

128.    Defendant violated N.Y. Lab. Law § 194 by compensating Plaintiff at a lower rate than her similarly situated male and non-Black colleagues.

129.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer damages including lost compensation and emotional distress.

130.    Defendant's violations were willful, entitling Plaintiff to liquidated damages under N.Y. Lab. Law § 198(1-a).

131.    Plaintiff is entitled to all remedies under New York Labor Law, including back pay, liquidated damages, attorneys' fees, and costs.

## SIXTH CAUSE OF ACTION
## NEW YORK LABOR LAW § 215

132.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

133.    Defendants paid Plaintiff less than male employees performing equal work in violation of the NYLL.

134.    New York Labor Law § 215 prohibits employers from discharging, threatening, penalizing, or in any other manner retaliating or discriminating against an employee because the employee has engaged in protected activity under the Labor Law, including but not limited to making a complaint about wage inequality or requesting a change in compensation believed to be unlawful under New York Labor Law § 194.

135.    Plaintiff engaged in protected activity under New York Labor Law by repeatedly raising concerns to senior leadership, including the Chief Executive Officer and her Managing

24

Director, regarding the significant pay disparities between her and her similarly situated male and non-Black colleagues.

136.    Plaintiff specifically requested that her base salary and bonus be adjusted to match the compensation of her peers performing substantially similar work, asserting that the discrepancies were unjustified and discriminatory.

137.    Defendant failed to remedy the pay disparity and, upon information and belief, took adverse action against Plaintiff in retaliation for engaging in protected activity, including but not limited to maintaining her compensation at an unequal level and ultimately terminating her employment on or about July 29, 2024.

138.    Plaintiff's protected complaints about pay inequality were a motivating factor in Defendant's decision to take adverse employment actions against her.

139.    As a direct and proximate result of Defendant's unlawful retaliatory conduct, Plaintiff has suffered and continues to suffer economic loss, including lost wages and benefits, as well as emotional distress, reputational harm, and other non-economic damages.

140.    Defendant's conduct was willful, knowing, and carried out in bad faith and in reckless disregard of Plaintiff's rights under New York Labor Law § 215.

141.    Plaintiff is entitled to all remedies under New York Labor Law, including back pay, liquidated damages, attorneys' fees, and costs.

## **PRAYER FOR RELIEF**

142.    WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

  (a)    Declaring that the acts and practices complained of herein are violations of Section 1981, the EPA, NYSHRL, and the NYLL;

(b)     Enjoining and permanently restraining these violations;

(c)     Directing Defendant to pay Plaintiff compensatory damages for her lost wages, lost benefits, front pay, mental anguish and emotional distress;

(d)     Directing Defendant to pay Plaintiff punitive damages;

(e)     Awarding Plaintiff pre- and post-judgment interest;

(f)     Awarding Plaintiff liquidated damages;

(g)     Awarding Plaintiff the costs of this action together with reasonable attorneys' fees; and

(h)     Granting such other and further relief as this Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated:  April 29, 2026
        Bellport, New York

MESIDOR PLLC

Marjorie Mesidor
Joseph Myers
30 Station Road, Suite 5
Bellport, New York 11713
(212) 930-6010
MM@marjoriemesidor.com
JM@marjoriemesidor.com

*Attorneys for Plaintiff*

26